Scrtbnkr, J.
(orally).
At the September term, 1887, of the Court of Common. Pleas of Cuyahoga County, the plaintiff in error was jointly indicted with Mary E. Brock, [j. A. Breck and George A. Harper, for forging an instrument purporting to be the last will and testament of Martha IT. McDonald. The indictment contained two counts; the first charged the parties accused with forging the alleged will, and the second charged them with uttering and publishing it as true and genuine, knowing it to be false.
*157 The defendants, Mary E. Breck and L. A. Breck, were placed upon trial at the January term, 1888, of the court of common pleas; the trial not being concluded at that term, the cause was continued until the April term, 1888, when these defendants were convicted and sentenced to imprisonment in the penitentiary.
At the April term, 1889, of the court of common picas, the present plaintiff in error was placed upon trial, convicted and sentenced to imprisonment in the penitentiary ; he now brings this proceeding in error to reverse the judgment pronounced against him upon that conviction, and to have the verdict set aside and a new trial granted.
Previous to interposing his plea in this case, the plaintiff'in error filed a motion to quash the indictment, and also a demurrer thereto; this motion and the demurrer were overruled, and it is assigned for error upon the record, that the court of common pleas erred in overruling the motion to quash, and the demurrer to the indictment.
The statute under which Mr. Corbett was indicted is section 7091 of the Revised Statutes. This section embraces a great many matters in respect to which forgery may be committed, but the part that covers the present case, omitting the other matter, is as follows :
“ Whoever falsely makes, alters, forges, counterfeits, prints, or photographs any record, will, testament * * * with intent to defraud, or utters or publishes as true and genuine any such false, altered, forged, counterfeited, falsely printed, or photographed matter, knowing the same to be false, altered, forged, counterfeited, falsely printed, or photographed, with intent to defraud, is guilty of forgery, and shall bo imprisoned in the penitentiary not more than twenty years nor less than one year.”
It is further provided by section 7218 :
“ In an indictment for falsely -making, altering, forging, printing, photographing, uttering, disposing of, or putting off, any instrument, it shall be sufficient to set forth its purport and value.”
*158 Again, in section 7223: “It shall be sufficient in an indictment where it is necessary to allege an intent to defraud, to allege that the party accused did the act with intent to deifeud, without alleging an intent to defraud any particular person or body corporate; and on the trial of such indictment it shall not be necessary to prove an intent to defraud any particular person, but it shall be sufficient to prove that the party accused did the act charged with intent to defraud.”
The first countin the indictment in this case, omitting some formal matter, is as follows: “The grand jury do find and present that Mary E. Breck, L. A. Breck, J. H. Corbett and G. A. Harper, late of the county aforesaid, on the 23d day of December, in the year of our Lord one thousand eight hundred and eighty-six, with force and arms, at the county aforesaid, unlawfully did falsely make, forge and counterfeit a certain will, which said false, forged and counterfeited will is of the purport and value following, to-wifc:”
(And here is set out a copy of the alleged forged instrument with the attestation clause.) “With intent thereby, then and there to unlawfully defraud, she, the said Martha Hall McDonald, then and there being the owner of all the property, both real and personal, so as aforesaid designated, named and described in said false, forged and counterfeited will, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Ohio.”
Tbe second count sets forth the uttering and publishing as true and genuine of the false and counterfeited will above set forth, “with intent thereby then and there to unlawfully defraud, they, the said defendants named, then and there at the time they so uttered and published said false, forged and counterfeited will, well knowing the same to be false, forged and counterfeited; and she, the said Martha Hall McDonald, on the said 23rd day of December, one thousand eight hundred and eighty-six, being the owner of all the property, both real and personal, so as aforesaid designated, named and described in said false, forged .and counterfeited will, contrary to the form of the statute in *159 such case made and provided, and against the peace and dignitjr of the state of Ohio.”
1. The objection to the indictment is predicated upon the language contained in sec. 5914 of the Revised Statutes:
“ Any person of full age and of sound mind and memory, and not under any restraint, having any property, personal or real, or any interest therein, may give and bequeath the same to any person by last will and testament lawfully executed.”
It is argued that under this provision of the statute no person can make a valid last will and testament unless such person is of full age, and of sound mind and memory, and not under any restraint. And it is said there is no averment in this indictment, that at the date of the instrument in question, purporting to be the last will and testament of Martha Hall McDonald, she was of full age; and it is urged, therefore, that it does not affirmatively appear therein that the parties charged have committed any offense; for, notwithstanding the averments contained in the indictment, Martha Hall McDonald may not have been of full age, and may not, therefore, have been competent to make a last will and testament. It may be true, it is said, that these parties did falsely make this instrument; that they uttered' and published it as true and genuine, knowing it to be false and forged, and yet they may be innocent of any crime under the statute. As to the requirement that the testatrix must be of sound mind and memory, it is conceded that no averment is necessary, because it is presumed that a person is of sound mind and memory unless the contrary is shown ; but there is no presumption as to the age of any individual. This objection struck us with a good deal of force, and we have given to it a very careful examination, and in making this examination have gone beyond the authorities cited by counsel in the argument.
It should be remembered, in this connection, that when the legislature revised the code of criminal procedure, in 1869, it *160 abolished many of the stringent rules formerly prevailing in the criminal law. But over and beyond this, we find a precedent sustaining the form of indictment here given. We find that by the English statute, which is found in Williams on Executors, it is provided in substance that, in order to enable a person to make a last will and testament, such person must be of the age of twenty-one years. The difference between the English statute and ours is, that our statute provides that a person must be of full age, whereas the English statute provides that the age shall be twenty-one years.
There is contained in “ Wharton’s Precedents of Indictments and Pleas,” volume 1, page — (sec. 268a), the form of an indictment for forging a will under the English statute, as follows: “ That J. S. on, etc., at, etc., feloniously did forge á certain will and testament, purporting to be the last will and testament of one A. B., with intent theweby to defraud.” This form appears to be taken from Arch. C. P. 19th edition, 25. Upon careful consideration of the matter, we conclude that the court of common pleas did not err in overruling the demurrer and the motion to quash the indictment.
2. It is also-urged, that the charge in the second count of the indictment, of uttering and publishing, is not warranted by the statute. That there can be no such thing, if I apprehend the force of the argument, as the uttering and publishing by an individual of a last will and testament. That the' term “ uttering and publishing,” contained in the statute, refers more particularly to commercial paper, notes, bills, instruments of that sort, which possess commercial attributes and a commercial character. In fact, that the power of uttering and publishing a last will and testament is vested exclusively in the probate court.
The statute defining the crime of forgery makes it an offense to utter and publish any of the instruments previously named, without limiting the operation of this language to any particular class of instruments. And we find it stated as a legal *161 proposition in Wharton’s Criminal Law, vol. 1, sec. 706, that a person may commit the crime of “ uttering and publishing ” a forged deed by putting it on record. The particular authority relied upon by the author is a case reported in the 27th Mich. 386, Perkins v. People. One of the j>oints there decided is this: “ The putting of a forged mortgage on record is a sufficient uttering. Collecting money upon it and endorsing the payments is also a sufficient uttering, whether the instrument itself was produced at the time of payment or not.”
In the opinion, Judge Cooley says: “ On the point whether the forged instrument had been uttered and published, the evidence was, that it had been recorded by some one.”
(The forgery in this case consisted in raising the amount of the moi’tgage).
“ It was insisted that these facts showed no uttering, but the court charged the jury that the putting of the forged instrument upon record and collecting money upon it was a sufficient uttering. To have a forged mortgage recorded is certainly making a very important use of it as a genuine instrument, and the court was right in holding it a sufficient uttering. But collecting money upon it was also an uttering, unless the fact that the debtor at the time supposed he was paying upon the original instrument, and that the forged paper was not produced, can distinguish this from an ordinary case. We think these circumstances unimportant: Every receipt of money, and indorsement thereof upon the forged paper was making use of it in a way implying an assertion of its genuineness, and was consequently a sufficient publishing of the instrument as true to make the offense complete.”
Again, in England, in a case reported in Denison’s Crown Cases, vol. 1, p. 319, Queen v. Tylney, Tuffs et al., the accused parties were charged with forging the will of William Tuffs, deceased, with intent to defraud the heir-at-law of the said William Tuffs. The indictment contained several counts. “The fourth count charged the defendants with uttering the will, knowing it to be forged with the like fraudulent intent. *162 The fifth count charged them with forging the will, with intent to defraud a certain person or persons, whose names are unknown to the jurors.” The sixth count charged them “with uttering the will, knowing it to be forged,” with the like intent as charged in the fifth count. That is, they were charged in this count with forging the will with intent to defraud certain persons, whose names were unknown to the jurors, and it was on this' sixth count that the accused were convicted.
It was very doubtful, upon the trial of the case, whether the evidence supported the allegation of an intent to defraud, for the reason that the defendant who was charged with the forgery was the only son of the alleged testator. He was the heir-at-law. An attempt was made to prove that there were children by a previous marriage, but the proof was very meagre upon this point, and failed to show the fact satisfactorily; nevertheless the jury found the party guilty of forging and uttering the instrument with intent to defraud. The case was reserved to the full court for consideration, and was fully argued. “ The judges were evenly divided on the question whether in the absence of evidence of the existence of some person whom the prisoner could have defrauded by a forged will, a count for forging with intent to defraud some person unknown, could be supported.” They therefore recommended that the prisoner be pardoned; but upon the question as to whether or not he could bo guilty of “ uttering and publishing” the forged will, not a doubt was suggested, either by counsel, or the court. In view of these authorities, as well as upon principle, wc think that the court below was correct in overruling the demurrer to the indictment.
3. During the pendency of the case, and before the trial was had, the defendant, by his counsel, interposed several motions to be discharged. The record shows that the indictment was returned at September term, 1887. At that term the party here complaining entered into a recognizance for his appear *163 anee at the next term, and the ease was continued generally. At the next term the same action was had; .the defendant again entered into recognizance for his appearance, and the case was continued generally.
At the April term, 1888, the sureties of Mr. Corbett surrendered him to the court; he was oommitted to jail, and the journal entry of the proceedings shows that the case was continued for want of time for trial. At the September term, 1888, the same order appears upon the journal, and the case was again continued for want of time for trial. At that term of the court the defendant made application for his discharge, and this was overruled, the defendant excepting. There had at that time been two successive continuances, as the journal and orders of the court show, for want of time to try the case. At the January term, 1889, the case, aecorSing to the journal entries, was continued for want qf material evidence. Two applications were made in writing, at that term, for the discharge of the defendant, for the reason that he had not been brought to trial as required by the statute; these applications were overruled, and the defendant excepted. At the April term, 1889, the defendant was brought to trial, and a verdict obtained and judgment rendered upon the verdict. At that term there were two applications for a discharge, and both of these applications were overruled.
The provisions of the statute relied upon in support of the objection to the jurisdiction and the right of the court to proceed after these applications for a discharge had been made, are sections 7309, 7310 and 7311.
Sec. 7309 provides: “No person shall be detained in jail without a trial, on an indictment, for a continuous period embracing more than two- terms after his arrest and commitment thereon, or, if he was in jail at the time the indictment was found, more than two terms after the term at which the indictment was presented; but he shall be discharged unless a continuance be had on bis motion, or the delay be caused by bis act.”
*164 Sec. 7310 is as follows: “No person shall be held by recognizance to answer an indictment, without trial, for a period embracing more than three terms, not including a term at which a recognizance was first taken thereon, if taken in term, time; but he shall be discharged unless a continuance be had on his motion, or the delay caused by his act, or there be not time to try him at such third term ; and in the latter case, if lie be not brought to trial at the next term, he shall be discharged.”
Sec. 7311 : “If, when the application is made for the discharge of a defendant under either of the last two sections, the court is satisfied that there is material evidence for the state which cannot then be had, that reasonable exertion has been made, to procure the same, and that there is just ground to believe that such evidence can be had at the next term, the cause may be continued, and the prisoner remanded, or admitted to bail : and if ho be not brought to trial at the next term, lie shall then bo discharged;”
Sec. 467 is also referred to; it provides for the continuance of cases in the courts of Cuyahoga county, from one term to another, the trial of wdiich is not concluded for want of time.
In this case, as I have said, there were two continuances generally while the defendant was out on recognizance. Under the ruling in the case in 42 Ohio St. 207, referred to in the argument, it will be presumed that these continuances were ordered by the court for good and sufficient reasons. Then came two continuances for want of time to try the case; ODe at the Ajiril term, 1888, and the other at the September term, 1888.
The Supreme Court ruled, in the case I have referred to, that it is competent for the trial court to continue a ease for an indefinite period, provided it is for the reason that the court has not time to try it. Then at the January term, 1889, the case was continued for want of evidence: the statute warrants one continuance on that ground. At the next term — the April term, 1889, the case was tried. We cannot see, therefore, in this condition of the record, that the court erred in overruling *165 the several applications of the defendant for discharge, and placing him upon trial.
4. A voluminous bill of exceptions was taken, embracing all the testimony introduced in the case, and showing certain exceptions noted on behalf of the defendant as]flthe trial proceeded.
Following now the course of the argument pursued by counsel for plaintiff in error, I come next to this objection : That the court erred in admitting in evidence certain declarations of Mary E. Breck, made in the absence of Mr. Corbett, some of which were made subsequent to February 19, the date of the probating of the will, and others prior to the 23d of December, the date of the alleged forgery. This will, as the indictment sets forth, and as the testimony tends to show — and when I say this will, I mean the instrument that is charged to be a forgery, — bears date the twenty-third of December, 1886 ; it was admitted to probate on the nineteenth of February, 1887, the alleged testatrix having died on the preceding day, February eighteenth, 1887.
Upon the trial of the case, certain declarations of Mary E. Breck were admitted in evidence. The disputediwill gave her a considerable portion of rhe property of the decedent. Some of these declarations or statements, as already observed, were made prior to the date of the execution of the instrument in controversy, and some of them were made subsequent to the date when the will, or disputed will, was admitted to probate.
Upon this branch of the case, which is a somewhat important one, I desire to refer to some of the testimony which is the ground of complaint here. W. B. Neff, an attorney of this city, was introduced as a witness on behalf of the State, and was asked by the prosecuting attorney this question :
“I will'ask you if you remember being at the office of the probate court, * * * on the occasion of the probating of the will of Martha Hall McDonald?” He answered, “ I was not there ; * * * * jf y0u will allow me to say that *166 my brother was there; I have no recollection myself of being there at the probating of the will. * * * * ” Q. What is your brother’s name? A. O. L. Neff.
Q. Was the defendant, about that date, at your office in company with Mrs. Mary E. Breck? A. Mr. and Mrs. Breck were at my office, I remember of that, that morning. I wouldn’t undertake to say that Mr. Corbett was with them ; I don’t know whether 1 saw him that day or some days after-wards ; I saw him shortly afterwards, I think, at my office.
Q. Have you ever acted as attorney for Mr. Corbett? A. Ho, I think not; I was attorney for the Brecks.
Q. Ho you recall- how many times you have seen Mr. Corbett at your office in company with the Brecks ? A. I would not undertake to say. I don’t think I ever saw Mr. Corbett before the probating of the will.
Q. I will ask you if you saw him at your office in company with the Brecks shortly after the probating of the will? A. Well, within a day or so.
(Down to this point no objection was taken by counsel for the defendant to the testimony that was being produced.)
Then came this question :
Q. And how many times have you seen him at your office in company with the Brecks ?
(This was objected to by defendant and the objection overruled, and the defendant excepted.)
Q. How often have you seen him at your office, within a week or ten days after the probating of the will, in company with the Brecks ? A. I should say he was there several times within ten days.
Q. Did you see Mr. and Mrs. Breck at your office on the morning of the probating of the will ? A. Yes, sir.
Q. Did you know about the time of Mrs. McDonald’s death ? A. I knew it the morning of the probating of the will.
(This examination was pursued by the State, showing that Breck was at the office of the witness and at the probate office *167 on the morning that the will was probated; then came the cross-examination by the counsel for the defendant.)
Q. Did Mr. and Mrs. Breck have a will with them ?
(It will be observed that in the examination in chief no inquiry had been made of the witness by counsel for the State as to any statements made, either by Mr. or Mrs. Breck, upon the occasion when they were at the office; the proof made, simply tended to show that they were at his office, and the purpose for which they were there; that is to say — to have this will probated, and in pursuance of that design that they after-wards went to the probate office.)
The counsel for defendant proceeded :
Q. Did Mr, and Mrs. Breck have a will with them ? A. I think so.
Q. And, of course, you read the contents then ? A. I looked it over; I looked over the paper they brought there.
Q. Did you advise its immediate probating then? A. I advised them to-probate it at once.
Q. At once? A. Yes, sir; and it was done as I stated.
Q. Now, afterwards, some time, Mr. Corbett was at your office; now I will ask you if he was there at your suggestion and request; did you want to see him? A. Well, I do not remember distinctly.
Q. Did you observe anything wrong in the manner of this paper that aroused your suspicions in the making of it ?
(Objection by plaintiff; sustained.by the court, to which ruling of the com-t the defendant excepts.)
Q. Can’t you state what was said and done there at that time, or the substance ?”
(It will be observed that the defendant is here calling for statements — for what was said and done there.)
A. Yes, sir.
Q. Suppose you tell it? A. Well, the substance of what was said was that Mrs. McDonald had died leaving that will; that Mrs. Breck had lived next neighbor to her, and had taken *168 care of her, and that the will was made in pursuance of talk had between Mrs. Breck and Mrs. McDonald, to the effect that she was to leave Mrs. Breck her property. I think they told me of what the property consisted — telling about some household furniture, and about some property on Washington street.
(So that these statements, at the instance of the defendant, ..statements of Mrs. Breck were, on the application of Mr. Corbett, brought to the attention of the jury.) Now we come to .the re-direct examination, by Mr. Eddy :
Q. I will ask you, Mr. Neff, if that was the instrument ? ■(Showing witness the will.) A. I should say so ; I saw it in the police court.
Q. With regard to the conversation there, I will ask you ‘if it was stated in whose handwriting that was? A. I ■really wouldn’t say, Mr. Eddy ; I don’t remember anything : about it.
Q. I will ask you if it was stated to you, at that time or subsequently, by any of these parties, Mr. or Mrs. Breck, or ■Corbett, as to who wrote that will.
(Objection by defendant; overruled by court; to which ruling of the court the defendant excepts.)
Q. Now, on the morning that you spoke of, was it stated to you by Mr. or Mrs. Breck or Corbett, as to whose handwriting that will was in? A. Well, I would be unable to answer that question, for the reason that wo spent several weeks in the police court on that and other questions, and I wasn’t there at the probating of the will.
(j). I will ask if yOu have heard the defendant make any ■statements with regard to that instrument as to whose handwriting it was in ? A. I don’t think Mr. Corbett ever made any statement to me on the subject — I don’t remember of any.
Q. Have you heard Mr. or Mrs. Breck, in his presence at :any time, state who wrote that instrument, or in whose handwriting it was ?
*169 (Objection sustained.)
Q. Well, I will ask you if you have heard Mr. or Mrs. Breck state who wrote that instrument and in whose handwriting it was?
(Objection by defendant; overruled by the court; to which ruling of the court defendant excepted.)
Now, here comes the material part of the testimony which is objected to, so far as the statements are concerned :
Q. Well, whom? A. My impression is that one or the other of them stated, I think, that the body of it was in the-■ handwriting of Mrs. Breck, and that the attestation clause was in the handwriting of Mr. Breck; possibly it may be the reverse, and that the attestation was -in the handwriting of Mrs. Breck — it was one or, the other.
Thereupon the witness was re-cross-examined.
Q. And in that conversation, Mr. Neff, was it -stated how she came to write it? A. Yes, I think it was.
Q. Well, what-was said about that ? A. That it was written at Mrs. McDonald’s request.
Q. From what or how ? A. From suggestions made by her as to what she wished to do with her property.
Q. And where did she say it was written, do you recall ?
A. I don’t claim to have any distinct recollection.
Q. And w'as anything said about the use of memoranda, whether it was made up of suggestions as to what disposition she wanted made of her property, or whether from memoranda made in her presenoe ? A. I don’t distinctly remember.
Q. In that conversation, did she say whether she had seen Mrs. McDonald sign the instrument or will? And did Mr. Breck say the same thing at that conversation ; what did they say at that conversation with reference to seeing her sign it?
A. They said she signed it- in their presence.
Q. And where, if you recall? A. It seems to me it was in the sitting-room.
Q. And what place? A. Over on Washington street, or *170 near there, where she lived — it was at the residence of Mrs. McDonald.
There was a further re-direct examination, but it is not important to pursue this matter further in this connection. As to the matter particularly objected to, namely, the statements of Mr. or Mrs. Breck, as to which of them had written the body of the will, and which the attestation clause, it -was not error to show in the re-examination whether this occurred on the occasion of the first visit at the office, or in some subsequent conversation. It clearly appears, however, that it was after the execution of the will, and after the death of Mrs. McDonald.
The court, in instructing the jury, among other things, said to them: “Your next inquiry will then be, what connection had the defendant with the making of said instrument of December 23, 1886. Examine the testimony carefully, and ascertain what were his relations to, and connection with, Mrs. Breck ; his knowledge of, and acquaintance wdth, said Martha Hall McDonald; how he came to be present at the signing of said instrument of December 23, 1886. Did he then know her, Martha Hall McDonald? Examine his conduct at the time of the execution of said instrument, and from said 23rd day of December, 1886, to and including his call on the day of the funeral of said Martha Hall McDonald.
“ As bearing upon this fifth inquiry, as against the defendant, you will entirely disregard all evidence, if any, as to .the acts, statement, declarations and conduct of L. A. Breck and Mrs. Breck after December 23, 1886, except what happened in the presence and to the knowledge of the defendant in and about the publication of the instrument of December 23, 1886”
"We think that in directing the jury to exclude all statements of Mr. and Mrs. Breck, made after December 23, 1886, the court was very liberal in behalf of the defendant, because, as it appears to us, there was established a conspiracy among all these parties, to forge this will, and to utter and publish it *171 as true and genuine; and there was evidently connected with this design a purpose to obtain the property mentioned in the will and thereby devised to Mrs. Breck. The indictment alleges that the object and purpose of committing the forgery was to defraud. In order to effectuate that purpose, the parties must not only forge the will, not only procure'it to be probated, but they must obtain control of the* property. It was not only a conspiracy to forge, utter and publish the will as true and genuine, but it was a conspiracy to enable the accused parties thereby to obtain control of property which belonged to others and not to them ; and anything said or done by cither of them in pursuance of that common purpose, with a'view to carrying it into execution, affects them all. Anything said or done in furtherance of a scheme formed to defraud, by parties shown to be connected with it., is ordinarily regarded as original evidence against all the parties to the conspiracy ; and we do not see why the conduct of Mrs. Breck, and her statements and acts after the will was admitted to probate, in the way of acquiring possession of the property covered by the will, and having reference thereto, although made after the death of the testatrix, and after the probating of the will, may not be competent evidence against all the parties connected with the principal transaction.
There were otherjstatements admitted, made by Mrs. Breck about the date of the execution of the first will. Perhaps I omitted to state that there was no contention but that on the fifteenth day of December, 1886, the deceased woman made a will in favor of her son, an illegitimate son it is true, by which will she gave all herj®property|to him. Statements of Mrs. Breck, made about that]time,jin the absence of Mr. Corbett, were given in evidence; thesefwere objected to. It appeared _ that she had been^informedjshortlyjafter the 15th of December that a will had beenjmade^by the deceased giving the property to her son, and a convei’sation"between the brother of the deceased and Mrs. Breck was given in evidence, showing that she was informedjof the’exeeution’of this will. This evidence *172 was competent to show that Mrs. Breck had been informed of the fact, had knowledge of the fact that a will had been made by which Mrs. McDonald gave her property to her son. Again, it was shown, that upon .one occasion Mrs. Breck looked up the bank book of the testatrix, and ascertained the amount of money she had in bank. It became important to show this, because it thereby appeared that Mrs. Breck had acquired knowledge — the person drafting the second will— had knowledge of the fact that the testatrix had money in the bank. And there were conversations on the part of Mrs. Breck with other persons, indicating that she had promptly asserted her claim, had attempted to collect rents, and had given notice to tenants occupying the devised premises, that the property was hers, all tending to show that Mrs. Breck was claiming under the disputed will, was seeking to obtain possession of the property of the testatrix in carrying out and executing the purpose to defraud, which it was alleged had been formed.
5. It was next objected that the court erred in admitting declarations of Mrs. McDonald made in the absence of Mr, Coi'bett, as to her intended disposition of the property, and evidence of her acts and conduct generally. At this point it may be proper to state, that before the trial of the present case, as the journal shows, Mr. and Mrs. Breck had been put upon their trial, and had been convicted, and a petition in error had been filed in this court to reverse the judgment of conviction. Upon very full argument and careful consideration of the questions presented, the judgment was affirmed. The case was taken to the Supreme Court and there the judgment of thecir-' cuit court was affirmed. The decision in that case applies to and settles several of the questions arising in the present case. Breck v. State, 4 C. C. R. 160.
Merely as explaining the purpose for which this evidence might be offered and received, it is proper to refer to the will in controversy ; the part to which I desire to refer is very short:
*173 “Cleveland, Ohio, December 23th, 1886.
“ I, Martha Hall McDonald, being this 23d day of December, 1886, sick, but of sound mind and memory, do make this last will and testament.
“ The day Joseph and John came they all three urged me to make my will, and so bewildered and crazed me that I forgot my promise and obligation to my only true friend on earth, Mrs. Mary E. Breck.”
Joseph was her son, and John -was her brother, and it may be proper to say here, that her brothers John and Francis, and her son Joseph all resided out of this state, in a distant part of the country. On the 22nd of November, 1886, a letter had been written by one Stevenson, at Mrs. McDonald’s dictation,, in which she says :
“ Cleveland, Ohio, November 22nd, 1886.
“Dear Brother William: — I now sit down to write you a few lines to let you know that I am very poorly, and I want to know where Joseph is, (Joseph was her son) or if you can send him here to take care of me, and will send him a pass to bring him here; and if he does come I will leave him pretty well off; all I have I will leave it to him. My husband has been dead over a year, and I have no one to care for me. I .want you to write to me at once and let me know what of the family is living yet. If Joseph is at home, I would like to have him come at once.
“ Your loving sister,
“ Martha McDonald.
“ Address, Mrs. McDonald, 241 WashingtorCstreet, Cleveland, Ohio.”
According to the instrument here in controversy, “ the day Joseph and John came they all three urged me to make my will, and so bewildered and crazed me that I forgot myprommise and obligation to my only true friend on earth, Mrs. *174 Mary E. Breck. Mrs. Breck is the one to whom I have gone in all my troubles and sickness for several years, and she has promised to care for me so long as I live and attend to me in my last sickness, and I agreed to give her all, or nearly all, of my property. Mrs. Breck has kept that promise to my full satisfaction, and as there is no reason why I should care anything for my relations, none of whom I have seen before for thirty-three years, 1 therefore annul the will 1 made, I think, December 14, 1886, drawn up by the book agent, Mr. Hewitt, and signed as witnesses by my brothers Francis and John.”
lij.With a view of showing the improbability that Mrs. McDonald had ever signed the instrument in which these statements are contained, viz : that she had forgotten her only true friend, and that there was no reason why she should care for her relatives, the State gave evidence tending to show that for several years prior to the will of December 15, 1886, .and in fact prior to the writing of the letter at her dictation, November 22, 1886, she had made statements and declarations as to the disposition she proposed to make of her property, and as to her situation and want of knowledge of her own people, and in regard to the property itself. The purpose was to show, as I have said, that it was utterly improbable that she should deliberately declare that she wanted her brother and son to come and see her, and that if the son came she would make provision for him, and then make the statements imputed to her in the disputed will executed a few days thereafter. This evidence was introduced as tending to show that the statements in the paper purporting to be a will executed by her December 23, were false, namely: that there was no reason why she should make a disposition of her property in favor of relations she had not heard of for many years, and that there ■was no reason why she should care for them ; this evidence was received for the purpose of raising a presumption that the testatrix had never executed an instrument containing such statements; and this evidence, we think, comes directly within • *175 the ruling in the case of Breck v. The State, which judgment, as I have said, was affirmed by the Supreme Court. And the same observation is true of another objection which the defendant below makes : that is, that the court erred in admitting testimony as to the traditions of the Hall family. The court, upon the trial .of the case, permitted testimony to be given, going somewhat fully into the history of the family; concerning the country they lived in; where and when Mrs. McDonald was married; about her son Joseph, and where he was born; and also the tradition, as it is called, that existed in the family, that Mrs. McDonald had removed to a distant part of the country; that her relatives had supposed her dead for a long period of years; the object and purpose of this testimony being to show that notwithstanding they had not met for a long period- of time there was no ill-feeling existing. This class of testimony we think is'also directly within the principle determined in the case of Breck v. The State of Ohio.
6. The next assignment of error is as follows: “ The court erred in refusing the request of Corbett to charge the jury that, if the signature of Mrs. McDonald was affixed to the will by herself, or by some one at her request, and the same was obtained by fraud, or deception practiced upon her, or by duress, or by undue influence, it is not a foi’gcry ; and in charging the ury that, unless Mrs. McDonald herself signed the instrument, it was forgery.” Upon the first point here made, the defendant, after the testimony had been closed, requested the court to charge the jury as here indicated, that is to say, that, the signature of Mrs.’ McDonald was affixed by herself, or by some one at her request, and the same was obtained by fraud, or deception practiced upon her, or by duress, or by undue influence, it is not a forgery.” As an abstract proposition, we suppose this request to be true. If the name of the deceased was affixed by herself, or eby some one at her request, and her signature, or the signature of the party who acted for her, was obtained by deception, or *176 fraud, or undue influence, it was not a forgery; but the question here is, was this proposition relevant — was there any testimony in the ease making it relevant ? If there was, of course it should have been given; if there was not, it would have been error on the part of the court to give the charge as requested. Upon the trial, the State gave'testimorty tending to show that the defendant, Corbett, had made an affidavit in the probate court, in the usual form, on the 19th day of February, 1887, that this will had been executed by the testatrix, in his presence; that it was signed by her in person, and that he had attested it in her presence, and at her request. The State had also introduced the following testimony of Mr. Neff, the witness already referred to, tending in the same direction :
“ Q. In any of these conversations in which you say there was some confusion in your mind, I will ask you if Mr. Corbett said anything abont the signing of this instrument, and whether he was present? A. Yes, Mr. Corbett told me he was present at the time it was signed.
“ Q■ When was this stated to you? A. He called at my office and told me he was present when the will was executed; he said that G. A. Harper was there; he said that Mrs. McDonald sat at a table in the sitting-room ; that Mr. Breck telephoned after Dr. West and came afterward with G. A. Harper, and that there, in the presence of the Brecksand Harper, and Corbett himself, the will having been read, Mrs. McDonald signed it; he told me that he signed it as a witness ; it was the signature of Martha Hall McDonald he was talking about.”
By mutual consent the original instrument in question is presented to us, together with certain documents bearing what are admitted to be genuine signatures of Mrs. McDonald; they are presented to us for inspection, and upon examination it is evident that the signature to the will is either the genuine or a simulated signature of Mrs. McDonald. Then, again, the State gave evidence tending to show that this signature is not the genuine signature of Mrs. McDonald. On the part of *177 the defense, the defendant Harper was offered as a witness, and he testified that he was present with Corbett and Breck at the time of the execution of this will; that Mrs. McDonald signed the will in person; that he signed it as a witness, and in her presence. The defendant also introduced the testimony of a number of experts, tending to show that the signature in question is the genuine signature of Mrs. McDonald. The testimony of the defense tended to establish that the disputed will bore the genuine signature of Mrs. McDonald. The evidence further shows that Mr. Corbett was well acquainted with Mrs. McDonald, and that he.had boarded with the Brecks, next door to her residence. There was no claim that he had been imposed upon by the Breaks, or anybody else, into attesting a will fraudulently procured. The issue was squarely made as toawhether or not the signature was the genuine signature of Mrs. McDonald, or whether it was a forged signature. This was the issue tried to the jury. No testimony was offered to show that this will had been signed by another person in the presence of the testatrix, and at her request. Nor wras there any testimony tending to show that any fraud or duress had been practiced upon her. We think, therefore, that the court very properly refused the instruction requested.
7. Objection is also taken to the third proposition charged by the court: “Is the instrument of December 23rd, 1886, the will of said Martha Hall McDonald"? That is, was the name Martha Hall McDonald signed to said instrument of December 23rd, 1886, by said Martha Hall McDonald, or was said name of Martha Hall McDonald signed to said instrument by some person other than said Martha Hall McDonald for the purpose and with the intent to give the said instrument effect as the last will of said Martha McDonald, and done with the intent to defraud the lawful heir or devisee of said Martha Hall McDonald?”
The argument is, that the court here assumes, in charging the j ury, that unless the will .so executed was, in point of fact, *178 signed by Mrs. McDonald in her own handwriting, it was a forged instrument. We think this is hardly just to the court. While the court does say to the jury that the question to be determined is: “ Is the instrument of December 23rd, 1886, the will of Martha Hall McDonald ? That is, was the name of Martha Hall McDonald signed to said instrument of December 23rd, 1886, by said Martha Hall McDonald, or was it signed by some other person, with intent to defraud the lawful heir or devisee of said Martha Hall McDonald?” — it certainly never intended the jury to understand that if the will had been signed, in'jpoint of fact, by the hand of some other person, at Mrs. McDonald’s request, it was a forgery, for it was not, under the evidence, called upon to express any opinion upon that proposition.
8. It is next objected, that the court erred in admitting certain testimony on the part of Joseph' Hall — the son of the decedent — as to what occurred at the time of the death of the testatrix. It appears from the testimony of this witness that he was present with his mother when she died, and among other things, he stated that her hands were then clasped in his, and that while passing away she raised one hand to wipe her forehead; that this hand again sought his, and in that position she died, as he says, with her eyes looking upon him to the end. It seems to us that this testimony falls within the principle determined in the case of JBreehy. The State.
On the 15th [of December she made a will, by which she gave her property to her son; she had done this as shown in the testimony, in pursuance of an intention previously formed so to do. There is interposed as against this will another will, in’which the testatrix is made to say that there is no reason why she should provide for her relatives, even for her son, accompanied with the statement-that these people are nothing to her; Avithin a few days thereafter she is found, if the testimony be true, manifesting the warmest affection for the son, and this in the supreme hour of her approaching dissolution.
*179 It was just as competent to prove the feeling thus expressed toward her son, by her acts and conduct, as if it had been by words; and it seems to us that the court was entirely right in permitting to go to the jury the fact that this woman, when upon her death-bed, was manifesting toward her son the love and affection that a mother ordinarily bears for her children. We think this testimony is clearly within the principle decided in the case of Breck v. The State..
9. The next objection touches the charge of the court in reference to Corbett’s appearing at the probate court in connection with the probate of the will. This objection has been substantially disposed of in what has been said concerning the uttering and publishing a forged will, knowing it to be false. The fact, that Mr. Corbett appeared in the probate court, and there as a witness testified in the usual manner to the execution of the will, makes no difference in the application of the doctrine before stated. It. is said that if any crime was committed on that occasion it was perjury and not forgery. Undoubtedly the defendant was guilty of perjury if he falsely and corruptly made the affidavit referred to ; but it does not follow that because the crime of perjury was committed the further crime of feloniously uttering and publishing a forged will was not- committed also. It is true, that as Mr. Corbett’s name appeared as a witness to the will, he might have been compelled to testify in regard to its due execution; but he could not be compelled to perjure himself. If he falsely stated upon oath that the instrument propounded was the true and genuine will of Martha Hall McDonald, well knowing that it was forged, and he did this for the purpose of aiding in having the will admitted to probate, he was guilty of uttering and publishing an instrument which he knew to be false.
10. The next' objection is to the action of the court in refusing to permit a certain portion of a letter to be read in evience. I must briefly turn to the record, in order that we *180 may ascertain exactly what was done as to the matter complained of. Upon the part of the State, Francis Hall, a brother of decedent, was called as a witness; he detailed a conversation that he had with his sister about the time of the execution of the will/ He was then inquired of by the State:
Q. What further conversation did you have with her at that time ?
(Objection by defendant; overruled by the court; to which ruling of the court the defendant then and there excepted.)
A. I took the letter out of my pocket.
Q. What letter?
(Objected to by defendant; to the question and to his repeating this letter.)
A. The letter I received from Mr. Stevenson. I read a part of that letter to her, then I said to Mrs. McDonald, if these women or neighbors have been kind to you, it would be right and proper that you give them something, and Mrs. McDonald replied very promptly and in earnest, and says, “ I will give none of them anything but what they earn ; they are none of them anything to me.”
(It will be observed that the witness did not undertake to read any part of this letter. He stated that he did read apart of it to his sister, and then stated what he said to her in that connection.)
In the course of the cross-examination the witness is asked this question :
Q. Have you that letter that you received from Mr. Stevenson? A. No, sir.
Q. What did you do with it? A. I am sure I cannot recall whether I gave it to Mr. Bacon or to Joseph; it went out of my possession.
Q. Have you ever seen it in the hands of the prosecuting attorney ? A. No, sir; it has been handed to me in court.
Q. In this court? A. I cannot-say which.
Mr. Green desires letter, saying : “ I propose to use it *181 with the witness, and will introduce it in evidence.” Whereupon the State hands Green, attorney for defendant, said letter.
Then conies this question :
Q. Did you, in the conversation that you had with your sister, on the day of your arrival, say to her, (here Green holds said letter and reads from letter, and refuses to show witness the letter or introduce it in evidence). “ I want to tell you there is a woman stopping with your sister at present, and I .think, by the way she talks, she wants to have your sister make a will and leave some of her property to her.” Now, the question is, “Did you say this to your sister;” that is, the counsel is asking witness: “ Did you say this to your sister: I want to tell you there is a woman stopping with your sister at present, and I think by the way she talks she wants to have your'sister make a will aud leave some of her property to her?”
Of course counsel did not mean to have the witness say that he told his sister that there was a woman stopping with her who wanted to have her make a will giving her part of the property; but that is the form of the question, and manifestly the counsel was reading from a letter, and by this means sought to get this portion of the'letter to the jury. I now proceed with the record :
(Objeotion by plaintiff; sustained by court; to which ruling of the court the defendant then and there excepted.)
Q. Are you able to tell all that was said by your sister, and all that was said by you to her, on the 11th day of December, when you spoke to her about making a will? A. I am not.
(Here Green copies from said letter, and refuses to show letter to witness, or introduce it in evidence, and then bases the following questions upon that part by him copied from the letter.)
Q. During that conversation, did you inform her that you had been informed by Stevenson that there was a woman *182 stopping with her whom a man (Stevenson) thought she wanted to have yon make a will and leave some of her property to her?
(This was objected to by the State.)
(Objection by plaintiff; sustained by court; to which ruling-of the court defendant then and there excepted.)
Then again
Q. In the conversation between you and your sister', on the 11th day of December, when you spoke to her about making a will, were these words used by you to her; (Green here reads from said copy from said letter, and refuses to band witness letter, or introduce it in evidence.) “ I want to tell you that there is a woman stopping with your sister at present, and I think, by the way she talks, she wants to have your sister make a will and leave some of her property to her?”
(Objection by plaintiff; sustained by court; to which ruling of the court defendant then and there excepted.)
State here asks Green if he intends to introduce said letter in evidence, and Green says, “No, I have made all the use of it I want to.” Counsel for the State afterwards offered the letter in evidence, but it was excluded on the application of defendant.
This witness, it will be observed, had testified that he had read a certain part of the letter to his sister; it was the letter written to him by Mr. Stevenson. On the cross-examination counsel undoubtedly had the right to have that part of the letter which the witness stated he had read to his sister given in evidence to the jury, but he had no right to have any other part, selected by him, given in evidence. He had the right to have that portion given to the jury, because it was part of the conversation; and also the sister’s answer to the remarks— what she said on that occasion. It was a matter, we think, within the discretion of the court, to direct what steps should be taken if counsel for defendant desired that part of the letter to go to the jury. It had been read to the sister, and in order to show to what extent, if any, she had been influenced *183 thereby, counsel had a right to call upon the witness to read to the jury that part which he had read to his sister. Counsel, however, was not at liberty to read other portions to the jury. We think the court had the right to exercise its discretion in that regard. And, although the witness was interrogated as to whether or not he had made certain statements, the record shows clearly that the questions counsel was asking were quotations of certain portions of the letter.
"We think that the court rightly exercised its power in excluding this evidence from the jury. If the counsel on the part of the defendant desired to make the entire letter evidence in his own behalf, he should have offered it; he not only refused to do this, but objected to its introduction by the State.
11. It is also insisted that the verdict is contrary to the evidence. Upon this point, without undertaking to review the evidence in detail, it is sufficient to say that we see no reason for disturbing the verdict.
12. It is said, also, that the court erred in stating to the jury that the defendant, Corbett, was present at the time the will was executed, and in not leaving that question to the jury. The record shows that the defendant himself gave evidence showing that he was present on that occasion, and this was not controverted. The court seems to have assumed that Mr. Corbett was present, and this was an undisputed fact. It is sufficient to say that this objection cannot be sustained.
13. It is further objected that the court erred in refusing to charge the following request:
“The testatrix, Mrs. McDonald, named-in the claimed forged will, may have made declarations and statements to her relatives and to others in the absence of the defendant, and the others accused, inconsistent with the statements in the will, and yet it is not impossible she should have made such and *184 also have executed the will; and if there is direct evidence that she did execute the will, the defendant should not be convicted merely by reason thereof.” We do not think that the court was bound to give this request. We think that the presiding judge was'exceedingly fair to the defendant in the instructions given to the jury.
Arnold Green, for plaintiff in error.
B. 0. Eddy, for defendant in error.
14. The only other assignment of error relates to the alleged failure of the court to instruct the jury that they must find from the testimony that Mrs. McDonald was of full age, and of sound mind and memory at the date of the execution of the alleged will. We have not examined the charge of the court with especial reference to this objection; but it does not appear in the record that any question was made during the trial but that Mrs. McDonald was of full age, and of sound mind and memory. This was tacitly conceded. The testimony on both sides shows very clearly that she was of sound mind, and a-woman advanced in years. It also shows that her son was born in 1842, more than forty years before the date of the paper in question.
We have now disposed of all the propositions submitted to us, and we have endeavored at least to give them full consideration.
I may say that we feel much indebted to counsel for the care and industry manifested in the preparation of the case, and thank them for the assistance rendered us in presenting it.
It only remains for us to announce the conclusion of the court, which,is, that the judgment of the Court of Common Pleas is affirmed, with costs.
[In the foregoing case a motion for leave to file a petition in error was overruled by the Supreme Court, January term, 1890.]